No. 24-13164

In the
**United States Court of Appeals
For the Eleventh Circuit**

MARTIN COWEN et al.,

*Plaintiffs – Appellants*

v.

SECRETARY OF STATE FOR THE STATE OF GEORGIA,

*Defendant – Appellee*

Appeal from the United States District Court
For the Northern District of Georgia

**APPELLANTS' BRIEF**

Bryan L. Sells
The Law Office of
Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212
bryan@bryansellslaw.com

*Attorney for the Plaintiffs–Appellants*

**Cowen v. Secretary of State for the State of Georgia**
**24-13164**

**Certificate of Interested Persons**
**and**
**Corporate Disclosure Statement**

Pursuant to Eleventh Circuit Rule 26.1, 26.1-2, and 26.1-3, counsel for the appellants certifies that the following persons and entities have or may have an interest in the outcome of this case:

Buckley, Allen

Carr, Christopher

Correia, Cristina

Cowen, Martin

Gilmer, Aaron

Heidt, Josiah B.

Libertarian Party of Georgia, Inc.

May, Leigh Martin

McGowan, Charlene S.

C-1 of 2

2

**Cowen v. Secretary of State for the State of Georgia**
**24-13164**

**Certificate of Interested Persons**
**and**
**Corporate Disclosure Statement**
**(continued)**

Monds, John

Raffensperger, Brad

Sells, Bryan L.

The Law Office of Bryan L. Sells, LLC

Webb, Bryan K.

Willard, Russell D.

Young, Elizabeth

Yu, Diana

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Appellants
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

C-2 of 2

## Statement Regarding Oral Argument

This is a constitutional challenge to Georgia's ballot-access restrictions on third-party candidates for United States Representative. No third-party candidate for United States Representative has appeared on Georgia's general-election ballot since the restrictions were first enacted in 1943 in response to the Communist Party's campaign to combat racial discrimination throughout the Jim Crow South.

The main issue in this appeal is whether discriminatory purpose matters at all in challenges to ballot-access laws. The district court held that it doesn't. But that ruling gets the legal standards wrong and would open Pandora's box if upheld.

Oral argument would be helpful to consider the consequences of the district court's ruling and the legal standards that apply in challenges to ballot-access laws alleged to have been enacted or maintained for a discriminatory purpose. This case also merits oral argument because the outcome could affect the choices available on the ballot to millions of Georgia voters for decades or even centuries to come.

# Table of Contents

Certificate of Interested Persons and
    Corporate Disclosure Statement ..................................... 2

Statement Regarding Oral Argument ..................................... 4

Table of Contents ..................................................... 5

Table of Citations ..................................................... 7

Statement of Jurisdiction ............................................. 12

Statement of the Issues ............................................... 13

Statement of the Case ................................................. 14

   I.    Georgia's Ballot-Access Restrictions .......................... 15

   II.   The Plaintiffs' Lawsuit ....................................... 21

   III.  The District Court's Summary Judgment Order ....... 26

   IV.  The District Court's Post-Judgment Order ............... 31

Standards of Review ................................................... 33

Summary of the Argument .............................................. 35

Argument ............................................................. 37

   I.    The plaintiffs never abandoned their viewpoint
       discrimination claim. ................................... 37

   II.   The Secretary is not entitled to summary judgment
       on the plaintiffs' Equal Protection claim. .................. 41

   III.  The district court abused its discretion by
       denying the plaintiffs' motion for leave to
       supplement their complaint ...................................... 47

Conclusion ............................................................... 51

Certificate of Compliance ....................................... 53

# Table of Citations

## Cases

*Adams v. City of Montgomery*,
   569 F. App'x 769 (11th Cir. 2014) .................................................. 40

*Allen v. Tyson Foods, Inc.*,
   121 F.3d 642 (11th Cir. 1997) ................................................. 33, 41

\* *Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ............................................. 23, 28, 36, 43, 45

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................... 33, 34, 42, 47

*Arce v. Walker*,
   139 F.3d 329 (2d Cir. 1998) ........................................................ 37

*Banister v. Davis*,
   590 U.S. 504 (2020) ...................................................................... 49

*Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.*,
   182 F.3d 888 (Fed. Cir. 1999) ...................................................... 37

*Brooks v. State Board of Elections*,
   848 F. Supp. 1548 (S.D. Ga. 1994) .............................................. 15

\* *Burdick v. Takushi*,
   504 U.S. 428 (1992) ................................................................ 28, 43

*Chapman v. AI Transport*,
   229 F.3d 1012 (11th Cir. 2000) .................................................... 33

*Clingman v. Beaver*,
   544 U.S. 581 (2005) ...................................................................... 43

*Cook v. Gralike*,
   531 U.S. 510 (2001) ........................................................................ 44

*Cowen v. Georgia Secretary of State*,
   960 F.3d 1339 (11th Cir. 2020) ............................................... 14, 27

*Cowen v. Secretary of State*,
   22 F.4th 1227 (11th Cir. 2022)......................................... 14, 26, 29

*Cox v. Barber*,
   275 Ga. 415 (2002)........................................................................ 44

*Czeremcha v. International Association of Machinists &*
   *Aerospace Workers, AFL-CIO*,
   724 F.2d 1552 (11th Cir. 1984) ................................................... 49

*DA Mortgage, Inc. v. City of Miami Beach*,
   486 F.3d 1254 (11th Cir. 2007) ................................................... 39

*Durand v. Raffensperger*,
   No. 2022CV365171 (Fulton Cnty. Super. Ct. Aug. 18, 2022)...... 44

*Dussouy v. Gulf Coast Investment Corp.*,
   660 F.2d 594 (5th Cir. Nov. 1981)................................................ 50

*Euclid Chemical Co. v. Vector Corrosion Technologies, Inc.*,
   561 F.3d 1340 (Fed. Cir. 2009)..................................................... 37

*Flynn v. Sandahl*,
   58 F.3d 283 (7th Cir. 1995) .................................................... 37, 38

*Graveline v. Benson*,
   992 F.3d 524 (6th Cir. 2021) ........................................................ 44

*Greater Birmingham Ministries v. Secretary of State*,
   992 F.3d 1299 (11th Cir. 2021) ............................................... 44, 45

*Herndon v. Lowry*,
   301 U.S. 242 (1937) ...................................................................... 16

*Hunter v. Underwood*,
  471 U.S. 222 (1985) ................................................................ 44, 45

*Jenness v. Fortson*,
  403 U.S. 431 (1971) ......................................................... 23, 24, 26

*Klay v. United Healthgroup, Inc.*,
  376 F.3d 1092 (11th Cir. 2004) ...................................................... 34

*Larios v. Cox*,
  300 F. Supp. 2d 1320 (N.D. Ga. 2004) ........................................ 44

*Manikan v. Peters & Freedman, L.L.P.*,
  981 F.3d 712 (9th Cir. 2020) ....................................................... 38

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ....................................................................... 34

*Mitutoyo Co. v. Central Purchasing, LLC*,
  499 F.3d 1284 (Fed. Cir. 2007) ............................................... 37, 41

*Nance v. Ricoh Electronics, Inc.*,
  381 F. App'x 919 (11th Cir. 2010) ................................................. 48

*Norman v. Reed*,
  502 U.S. 279 (1992) ................................................................. 28, 43

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ...................................................................... 39

*Resolution Trust Corporation v. Dunmar Corporation*,
  43 F.3d 587 (11th Cir. 1995) ......................................................... 40

*Rowe v. Schreiber*,
  139 F.3d 1381 (11th Cir. 1998) ..................................................... 40

*Stallworth v. Shuler*,
  758 F.2d 1409 (11th Cir. 1985) ..................................................... 49

\* *Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ........................................................ 39

*Wood v. Third Federal Savings & Loan Association,*
No. 23-3042, 2023 WL 8174269 (6th Cir. Nov. 20, 2023) ............ 37

**Statutes**

28 U.S.C. § 1291 .............................................................. 12

28 U.S.C. § 1331 .............................................................. 12

Act of April 3, 1986, ch. 284, 1986 Ga. Laws 890 .......................... 20

Act of March 20, 1943, Ch. 415, 1943 Ga. Laws 292 ...................... 18

Act of October 2, 1948, ch. 1, 1949 Ga. Laws 3 ............................ 19

O.C.G.A. § 21-2-172 ......................................................... 21

**Other Authorities**

6A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 1504 (3d ed.) ......................... 48

6A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 1509 (3d ed.) ......................... 48

Edward Hatfield, *Communists*, New Georgia Encyclopedia*,*
https://www.georgiaencyclopedia.org/articles/history-
archaeology/communists/ ............................................... 16

Federal Rule of Civil Procedure 1 ...................................... 50

Federal Rule of Civil Procedure 11 ..................................... 38

\* Federal Rule of Civil Procedure 15 ........................................ 34, 48

\* Federal Rule of Civil Procedure 56 ................................. 33, 38, 41, 47

Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (2003) ............................................ 15

## Statement of Jurisdiction

This is an appeal from a final judgment of the district court entered on September 27, 2023. (App. III:215 at 1.)[1] The plaintiffs filed a motion to alter or amend the judgment 26 days later. (App. III:216 at 1.) The district court denied that motion on August 26, 2024 (App. III:229 at 6), and the plaintiffs filed their notice of appeal 30 days after that (App. III:230 at 1). This Court therefore has jurisdiction under 28 U.S.C. § 1291.

The district court had subject-matter jurisdiction because this case presents federal questions. 28 U.S.C. § 1331.

---

[1] Throughout this brief, citations to the Appendix will be in the form "App. Volume:Tab at Page" unless otherwise noted.

## Statement of the Issues

1.     Did the plaintiffs' abandon their viewpoint discrimination claim by choosing not to move for summary judgment on it?

2.     Is the Secretary entitled to summary judgment on the plaintiffs' Equal Protection claim under their discriminatory purpose theory even though the Secretary conceded that the purpose of the challenged statute is genuinely disputed?

3.     Did the district court abuse its discretion when it denied the plaintiffs' motion for leave to file a supplemental complaint based on a related ballot-access statute enacted while the case was pending?

## Statement of the Case

This is a constitutional challenge to Georgia's ballot-access restrictions on third-party candidates for U.S. Representative. Those restrictions are by far the most stringent in the nation, and—despite many attempts—no such candidates have appeared on the general-election ballot since the restrictions were first enacted in 1943 in response to the Communist Party's campaign to combat racial discrimination throughout the Jim Crow South.

This is now the third time this case has come before this Court. *See Cowen v. Sec'y of State*, 22 F.4th 1227 (11th Cir. 2022) ("*Cowen II*"); *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339 (11th Cir. 2020) ("*Cowen I*"). In both previous instances, the plaintiffs' discriminatory purpose theory was not at issue. *See Cowen II*, 22 F. 4th at 1231 n.2; *Cowen I*, 960 F.3d at 1347. That theory, plus the district court's denial of the plaintiffs' motion for leave to supplement their complaint with allegations regarding a 2024 change to Georgia's ballot-access laws, are the subjects of this appeal.

## I.    Georgia's Ballot-Access Restrictions

The ballot-access restrictions at issue here have their origin in anti-Communist legislation fueled by Georgia's ugly history of racial discrimination against Black people in virtually all aspects of life. *See, e.g., Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception."); *see generally* Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (2003).

In the late 1920s and 1930s, the Communist Party launched a campaign to combat racial discrimination against African Americans and to encourage interracial cooperation throughout the Jim Crow South. (App. III:210-4 at 8, 22.) The party established a weekly newspaper, *The Southern Worker*, and sent organizers across the region to spread its radical message of racial equality and solidarity among the working class. *See generally* Edward

Hatfield, *Communists*, New Georgia Encyclopedia*,*

https://www.georgiaencyclopedia.org/articles/history-archaeology
/communists/.

In Georgia, the campaign generated a strong backlash against
the party by state and local officials who sought to maintain the
state's racial caste system. *Id.* Police conducted a series of "Red
Raids" against suspected Communists, charging them with inciting
an insurrection under a law originally designed to discourage slave
rebellions that carried a possible death sentence. *Id.* The most
famous of these involved Angelo Herndon, a young African-
American communist organizer who was arrested in July 1932 for
distributing Communist literature advocating racial equality.
Herndon was convicted and sentenced to 18-to-20 years in prison.
After a series of appeals, the United States Supreme Court
overturned his conviction in a 5-to-4 decision striking down
Georgia's insurrection statute. *See Herndon v. Lowry*, 301 U.S. 242
(1937).

The backlash against the Communist Party also extended
into the political arena. The Communist Party's presidential

ticket—which included an African-American vice-presidential nominee, James W. Ford, and ran on a platform explicitly calling for racial equality and self-determination for the Black Belt—had appeared on Georgia's ballots in 1932. (App. III:210-5 at 1-2; App. III:210-6 at 2, 4.) In 1935, a few months after a textile workers' strike prompted another round of Red Raids, the Georgia General Assembly passed a bill banning the Communist Party from state ballots that was vetoed by the Governor when it reached his desk. (App. III:210-7 at 1-3.)

In 1940, the Communist Party's presidential ticket once again included James W. Ford as the vice-presidential nominee, and the party's platform once again called explicitly for racial equality. (App. III:210-8 at 12, 14.) Notwithstanding state law, Georgia's Secretary of State, John B. Wilson, unilaterally barred the party from the state's ballots on the ground of public policy. (App. III:210-9 at 2, 4.) Shortly after the election, Secretary Wilson was reported to be seeking legislation to keep the Communist Party permanently off the ballot. (App. III:210-10 at 2.) He proposed a bill requiring all candidates for state and national office in Georgia to file with the

17

secretary of state sufficient information to determine whether the party "is designed to overthrow our constitutional form of government." (*Id.*) Although the Communist Party wouldn't be mentioned in the bill, Wilson said that "it and any other similar party would be the primary target." (*Id.*)

Although the General Assembly didn't take up Wilson's proposal at its 1941 session, it did adopt a law imposing a five-percent petition requirement for candidates at its next regular session in 1943. Act of March 20, 1943, Ch. 415, 1943 Ga. Laws 292. The media reported that the petition requirement was designed to "sustain[] Secretary of State John B. Wilson in refusing a Communist candidate for president a place on the Georgia ballot in the 1940 election." (App. III:210-11 at 2, 4.)

A few weeks earlier, the Georgia Senate had adopted a resolution printing a recent speech from United States Senator Richard Russell in the journal of the State Senate. Russell, an ardent segregationist, gave the speech on the floor of the Senate in opposition to a bill that would have outlawed poll taxes in eight Southern states. He claimed that the Communist Party, which he

accused of having fomented racial unrest in his state, was behind the bill. And he noted that the "only thing which has done more than the Communist party through the distribution of pamphlets to tear down good relations which men of good will in both races have painstakingly and earnestly created over a long period of years has been the proposal of measures such as the [anti-poll-tax bill] before the Senate at this time." (App. III:210-12 at 12.)

In October 1948, the Georgia General Assembly was called into a special session and temporarily suspended the petition requirement for presidential candidates so that the Dixiecrat candidate, Strom Thurmond, could appear on Georgia's ballot. Act of October 2, 1948, ch. 1, 1949 Ga. Laws 3. The act also expressly barred Communist Party candidates and retroactively changed the rules that applied to petitions for non-presidential offices that had already been submitted. *Id.* This had the effect of disqualifying Larkin Marshall, a prominent African-American newspaperman from Macon who had been nominated for United States Senator by the Progressive Party and who had earlier submitted a petition meeting the requirements then in force. (App. III:210-13 at 6.)

The five-percent petition requirement remained substantively unchanged until 1986, when the General Assembly lowered the requirement to one percent—but only for statewide candidates. Act of April 3, 1986, ch. 284, 1986 Ga. Laws 890. Before the change, the General Assembly held a hearing on legislative proposals to ease ballot access for some third-party candidates. Richard Winger testified at the hearing and urged committee members to adopt a process that would allow third parties to qualify for all offices. One legislator on the committee responded, "I don't want some damned Libertarian running against me." (App. III:210-14 at 3.)

The five-percent petition requirement for non-statewide offices remained in place and has been substantively unchanged since 1986. And no third-party candidate for United States Representative has ever satisfied it.

In 2024, the Georgia General Assembly tinkered again with the State's ballot-access laws—but only for presidential candidates. It eliminated the signature requirement for any presidential candidate whose party "has obtained ballot access in no fewer than 20 states or territories for the office of presidential elector."

O.C.G.A. § 21-2-172(g). As a result of this change, presidential-elector candidates nominated by the Libertarian Party and the Green Party qualified for ballot access in Georgia in 2024 without having to submit *any* petition signatures.

## II.    The Plaintiffs' Lawsuit

The plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters.[2] They sued the Secretary of State in 2017, claiming that Georgia's ballot-access laws violate the First and Fourteenth Amendments and the Equal Protection Clause. (App. I:1 at 37.)

Among other things, the plaintiffs alleged that Georgia's five-percent petition requirement was adopted with a discriminatory purpose. (App. I:1 at 6.) The Secretary answered that he was "without knowledge or information sufficient to form a belief as to the truth of [that] allegation." (App. I:14 at 4.) But the Secretary

---

[2] The Libertarian Party has Black members, and one of the individual plaintiffs is Black. (App. III:210-16 at 2.) In addition, the Libertarian Party's platform contains a strong anti-discrimination plank that opposes government actions that discriminate on the basis of race. (*Id.*)

later revealed that he intended to dispute that fact based on a 1948 opinion of the Georgia Attorney General asserting that the purpose of the five-percent requirement "was to prevent persons with little or no following encumbering the official ballot." 1948 Ga. Att'y Gen. Op. 158, 158-59. (App. I:57 at 3; App. I:73-10 at 1-2.)

The parties filed cross-motions for summary judgment in 2019. The plaintiffs only sought summary judgment on their undue burden theory under the First and Fourteenth Amendments and their classification theory under the Equal Protection Clause. (Pls.' Br. Supp. Mot. Summ. J. 25-44 (ECF 69-1); Pls.' Resp. Opp. Def.'s Mot. Summ. J. 20 n.4 (ECF 96).) The Secretary sought summary judgment on all of the plaintiffs' claims, including their discriminatory purpose theory. (Def.'s Br. Supp. Mot. Summ. J. 7-32 (ECF 73-2).)

The actual purpose of the petition requirement was hotly disputed as a factual matter. (App. I:69-2 at 10-13; App. II:97 at 10-14.) The plaintiffs relied primarily on the testimony of Darcy Richardson, an expert historian, who testified—based on his review of historical documents—that the petition requirement was enacted

22

with the purpose of preventing Communist Party candidates from appearing on Georgia's ballots. (App. I:69-20 at 6; App. I:69-27 at 8-9; App. I:69-37 at 1-5.) The Secretary relied on the 1948 Attorney General opinion that he had disclosed earlier. (App. I:73-10 at 1-2.)

The district court granted summary judgment in the Secretary's favor a few months later. Finding itself bound by *Jenness v. Fortson*, 403 U.S. 431 (1971), which upheld an earlier version of Georgia's ballot-access requirements as constitutional, the district court summarily rejected the plaintiffs' claims. (App. II:113 at 8-15.) But the court denied as moot the Secretary's motion for summary judgment on the plaintiffs' discriminatory purpose theory. (*Id.* at 9 n.5.)

The plaintiffs appealed. A three-judge panel of this Court then vacated the district court's judgment and remanded the case for further proceedings. *Cowen I*, 960 F.3d at 1347. On the plaintiffs' First and Fourteenth Amendment claim, the panel held that the district court had erred in failing to apply the three-step balancing test set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (known as the "*Anderson* test"). *Cowen I*, 960 F.3d at 1345-

46. On the plaintiffs' Equal Protection claim, the panel held that *Jenness* wasn't controlling because the Equal Protection claim here is sufficiently different from the claim presented in *Jenness*. *Id.* at 1347. The panel remanded the case to the district court to reconsider those claims under the proper legal standards. *Id.*

On remand, the parties again filed cross-motions for summary judgment. The plaintiffs again sought judgment only on their undue burden theory under the First and Fourteenth Amendments and their classification theory under the Equal Protection Clause, expressly noting that they didn't move for summary judgment on their discriminatory purpose theory "because the parties have a genuine factual dispute about that purpose." (Pls. 2d Mot. Summ. J. 2 n.1 (ECF 134).) The Secretary also didn't seek summary judgment on the plaintiffs' discriminatory purpose theory. (Def.'s Br. Supp. 2d Mot. Summ. J. 12-25 (ECF 135-1).)

Several months later, the district court granted the plaintiffs' motion for summary judgment on their undue burden theory but granted the Secretary's motion on the plaintiffs' classification theory. (App. II:159 at 47.) The court also noted that the plaintiffs

hadn't moved for summary judgment on their claim "that the laws were adopted with a discriminatory purpose" (*id.* at 11 n.2), and that the Secretary "did not specifically address that claim in his briefing" (*id.* at 47). But because the court had granted summary judgment on the plaintiffs' undue burden theory, the court directed the plaintiffs to explain why their discriminatory purpose theory shouldn't be dismissed as moot and "whether they are still requesting a trial as to that claim." (*Id.* at 46.)

The plaintiffs responded to the district court's order by explaining that their discriminatory purpose theory "is not yet moot" but could become moot once the court imposed a remedy. (Pls.' Br. Resp. Ct. Order 10 (ECF 160).) The Secretary asked the court to enter summary judgment on the discriminatory purpose theory or to deny it as moot. (Def.'s Resp. Opp. Pls.' Remedies 16 (ECF 163).) The plaintiffs replied that summary judgment would be inappropriate in any event because there was a genuine dispute of fact. (Pls.' Reply Resp. Ct. Order 15 (ECF 164).) The district court concluded that the plaintiffs' discriminatory purpose theory was moot because it had held the petition requirement to be

unconstitutional under the plaintiffs' undue burden theory. (App. II:165 at 8-9.)

Both sides then appealed. A second panel of this Court reversed the district's court's ruling on the plaintiff's First and Fourteenth Amendment claim. *Cowen II,* 22 F.4th at 1236. The panel concluded that, although *Jenness* didn't automatically control the plaintiffs' claim here, the plaintiffs had identified no material distinction between this case and *Jenness* that would warrant a different result. *Id.* at 1231-34. The panel affirmed the district court's ruling on the plaintiffs' Equal Protection claim. *Id.* at 1234-35. And the panel expressly noted that the plaintiffs' discriminatory purpose theory "is not at issue here." *Id.* at 1231 n.2.

## III.   The District Court's Summary Judgment Order

On remand again, the Secretary filed a third motion for summary judgment—seeking judgment this time on the plaintiffs' discriminatory purpose theory. The Secretary conceded a genuine factual dispute about the purpose of the petition requirement,

however, and he didn't submit a statement of undisputed material facts along with his motion. (App. III:209 at 1.) Instead, the Secretary represented to the court that his motion presents only "an issue of law." (*Id.*)

Almost ten months later, the district court granted summary judgment again. (App. III:214 at 13.) The court first determined that "the *Anderson* test governs the equal protection analysis" of the plaintiffs' discriminatory purpose theory. (*Id.* at 7.) The *Anderson* test requires a court to (1) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (2) "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule"; and (3) weigh those factors and "decide whether the challenged provision is unconstitutional." *Cowen I*, 960 F. 3d at 1342.

Under the *Anderson* test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of the scale, the law "imposes only 'reasonable,

27

nondiscriminatory restrictions' upon First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places discriminatory or "severe" burdens on the rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance." *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

 But here, the district court held that discriminatory purpose is irrelevant under the *Anderson* test: "the *Anderson* test is not about the alleged discriminatory intent behind the statute; it asks instead about the effects of the statute." (App. III:214 at 8.) And because it found that a statute's purpose is irrelevant, the district court concluded that "the Eleventh Circuit's determination of the severity of the burden [in *Cowen II*] controls here." (*Id.* at 9.)

Turning to the second step in the *Anderson* test, the district court held that "the alleged discriminatory purpose is again outside the Court's analysis." (*Id.* at 10.) The Secretary offered no new

state interests in his motion, so the court considered the three interests that the Eleventh Circuit had considered in *Cowen II*: "requiring a showing of support for a candidate before putting them on the ballot, maintaining orderly administration of elections, and avoiding confusion and frustration of the democratic process at a general election." (*Id.* at 11.)

For the third step in the *Anderson* test, the court also followed the Eleventh Circuit's analysis, reasoning that if those interest were sufficient to justify the burden in *Cowen II*, then they were sufficient to justify the burden here because "*Anderson* requires the Court to examine the effects of the law and how the law serves state interests, not the legislative intent." (*Id.*) Thus, the district court concluded that Georgia's ballot access laws don't violate the Equal Protection Clause under the plaintiffs' discriminatory purpose theory.

The district court addressed the actual purpose of Georgia's ballot access laws only in a footnote. (*Id.* at 12-13 n.5.) Even though the Secretary had conceded a genuine dispute on that issue, the district court held that the plaintiffs' evidence—which included

29

expert testimony, lay-witness testimony, and documents from the historical record—was "not sufficient to create a genuine issue of material fact about whether the 5% signature requirement was adopted with a discriminatory intent, and it does not show that it has a racially discriminatory effect." (*Id.*) Then, without any discussion of state interests or narrow tailoring, the district court concluded that the Secretary was entitled to summary judgment "even if strict scrutiny applied to this analysis." *(Id.)*

Finally, the court turned to the plaintiffs' arguments that the challenged statutes also warrant strict scrutiny (1) under the First and Fourteenth Amendments because they constitute viewpoint discrimination and (2) under the Equal Protection Clause because they were adopted or maintained with a racially discriminatory purpose. The district court found that the plaintiffs "do not have an outstanding First Amendment claim" and therefore "cannot raise a new claim for the first time in response to the Defendant's Motion." (*Id.* at 12.) Likewise, "Plaintiffs have not previously brought a race discrimination claim in this case and cannot raise one now." (*Id.*) The court didn't address the merits of those arguments.

## IV.    The District Court's Post-Judgment Order

Shortly after the district court granted the Secretary's third motion for summary judgment, the plaintiffs filed a motion to alter or amend the judgment. The plaintiffs asked the court to reconsider its conclusion that the plaintiffs had never raised a viewpoint discrimination claim, pointing out that the court itself had recognized the claim in its order granting the Secretary's first motion for summary judgment. (App. III:216 at 2; App. II:113 at 9 n.5.)

While that motion was pending, the plaintiffs also filed a motion for leave to file a supplemental complaint. (App. III:226) The proposed supplement included factual allegations and an additional claim arising from a 2024 change to Georgia's ballot-access statutes. (App. III:226-1.)

In August 2024, the district court denied both motions. The court found that the plaintiffs "never actually pursued a viewpoint discrimination theory" despite having "various opportunities to raise this issue," including "their own Motion for Summary Judgment." (App. III:229 at 4.) Because the plaintiffs "failed to

substantively address viewpoint discrimination until their Response to Defendant's Third Motion for Summary Judgment," the court concluded that the theory "has been long abandoned." (*Id.*)

As for the plaintiffs' motion to supplement, the district court found that the motion was "moot" because the court had already granted the Secretary's third motion for summary judgment, "leaving Plaintiffs without a pending case to supplement." (*Id.* at 5.) The court also concluded that permitting the plaintiffs to supplement, rather than bring their claim as a new action, would delay the resolution of the case and unfairly prejudice the Secretary. (*Id.* at 5.)

This appeal followed. (App. III:230.)

## Standards of Review

*1.    Summary Judgment*

This Court reviews a district court's grant of summary judgment de novo, applying the same legal standards used by the district court. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute about a material fact is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether to grant or deny summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matter, but to determine only whether a genuine issue

33

exists for trial. *Id.* at 249. In doing so, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2.    *Supplemental Complaint*

The decision whether to grant a motion for leave to file supplemental pleadings is generally within the discretion of the district court. *See* Fed. R. Civ. P. 15(d). This Court reviews a district court's denial of a motion for leave for an abuse of discretion. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1211 (11th Cir. 2008). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, [] makes findings that are clearly erroneous," or applies the law in an unreasonable or incorrect manner. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (quotation omitted).

## Summary of the Argument

This Court should vacate the district court's judgment for three independent reasons.

*First*, the district court erred when it held that the plaintiffs abandoned their viewpoint discrimination claim under their discriminatory purpose theory by choosing not to move for summary judgment on it. Indeed, it's well established that a plaintiff doesn't abandon a claim by choosing not to move for summary judgment, and that's especially true when the facts are disputed.

Here, the legislature's purpose in adopting and maintaining Georgia's five-percent petition requirement has been disputed since early in discovery, and the plaintiffs have been diligent about preserving their discriminatory purpose theory whenever the Secretary put it at issue. The district court even recognized the plaintiffs' viewpoint discrimination claim early in the case. (App. II:113 at 9 n.5.) Because the plaintiffs never abandoned that claim, this Court should vacate the judgment and remand the case for trial.

*Second,* the district court erred when it held that discriminatory purpose is irrelevant to the plaintiffs' claim under the Equal Protection Clause. Discriminatory purpose matters under the *Anderson* test because ballot-access restrictions adopted or maintained with a discriminatory purpose are subject to heightened scrutiny. *See Anderson*, 460 U.S. at 794.

Here, discriminatory purpose matters because the Secretary has conceded the existence of a genuine dispute about that purpose and because he hasn't argued that Georgia's five-percent petition requirement would satisfy heightened scrutiny. Summary judgment is thus inappropriate, and this Court should remand the case for trial.

*Third*, the district court abused its discretion when it denied the plaintiffs' motion for leave to supplement their complaint. The court denied the motion because it concluded—erroneously—that a plaintiff may not supplement a complaint after judgment has been entered. But that is not the law. A plaintiff may supplement whenever the case is properly before the district court, and this case was still pending before the district court on the plaintiffs'

motion to alter or amend the judgment. The proposed supplement

was timely and directly connected to the original complaint, and it

would waste everyone's time and resources to file the supplement

as a new case—something the district court explicitly recognized

that the plaintiffs could do. This Court should therefore remand the

case with instructions to allow the supplemental complaint.


## Argument

### I.  The plaintiffs never abandoned their viewpoint discrimination claim.

A plaintiff doesn't abandon a claim by choosing not to move

for summary judgment. *Wood v. Third Fed. Sav. & Loan Ass'n,* No.

23-3042, 2023 WL 8174269, at *2 (6th Cir. Nov. 20, 2023); *Euclid*

*Chem. Co. v. Vector Corrosion Technologies, Inc.*, 561 F.3d 1340,

1345-46 (Fed. Cir. 2009); *Mitutoyo Co. v. Central Purchasing, LLC,*

499 F.3d 1284, 1291 (Fed. Cir. 2007); *Brasseler U.S.A. I, L.P. v.*

*Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999); *Arce v.*

*Walker*, 139 F.3d 329, 337 (2d Cir. 1998); *Flynn v. Sandahl*, 58 F.3d

283, 288 (7th Cir. 1995). That is especially true when the facts are

disputed. *See* Fed. R. Civ. P. 56(a); Fed. R. Civ. P. 11(b)(2). "The purpose of a summary judgment motion is not to preserve legal arguments for appeal; rather, it is to eliminate useless trials on undisputed issues of fact." *Flynn*, 58 F.3d at 288.

"An issue is abandoned only when a party has had a full and fair opportunity to ventilate its views on the issue and instead chooses a position that removes the issue from the case." *Manikan v. Peters & Freedman, L.L.P.*, 981 F.3d 712, 718 (9th Cir. 2020) (cleaned up).

Here, it has been apparent since early in discovery that the legislature's purpose in adopting and maintaining Georgia's five-percent petition requirement is the subject of a factual dispute. (App. I:57 at 3.) That purpose is the basis for the plaintiffs' viewpoint discrimination claim under the First and Fourteenth Amendments.

The Supreme Court has recognized a category of laws that, while facially content-neutral, are actually content-based regulations of speech that are presumptively unconstitutional: laws that were adopted by the government "because of disagreement

with the message that [the speech] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Laws in this category, like those that are content-based on their face, must satisfy strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015); *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266 (11th Cir. 2007). And, in determining whether a challenged law falls into this category, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791; *accord DA Mortg. Inc.*, 486 F.3d at 1266. A content-neutral ballot-access law adopted or maintained for the purpose of discriminating against a particular political party would therefore be subject to strict scrutiny under the First and Fourteenth Amendments.

The plaintiffs, moreover, have been diligent about preserving their discriminatory purpose theory whenever the Secretary put it at issue, and they have never taken any position that removes the issue from the case. The district court even recognized the plaintiffs' viewpoint discrimination claim early in the case. (App. II:113 at 9 n.5.) It was therefore error for the district court to conclude, *sua sponte*, that the plaintiffs had abandoned their

39

viewpoint discrimination claim under the circumstances of this case.

The three cases on which the district court relied are not to the contrary. It relied first on *Adams v. City of Montgomery*, 569 F. App'x 769, 772 (11th Cir. 2014) (per curiam), in which this Court held that an argument that hasn't been briefed on appeal is deemed abandoned. In that case, though, the appellee had raised an issue in its brief, and the plaintiff failed to respond to that issue in his reply. *Id.* In this case, by contrast, the plaintiffs have briefed the discriminatory purpose issue every time the Secretary raised it.

The district court also relied on *Rowe v. Schreiber*, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998), in which this Court held that a criminal defendant who fails to brief issues presented in the appeal has thereby abandoned them. But here, the plaintiffs' discriminatory purpose theory has never been at issue in an appeal until now.

Third, the district court cited *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc), in which this Court held that an issue not briefed *in response to a*

40

*motion for summary judgment* on that issue is abandoned. *Id.* But here, the plaintiffs briefed the discriminatory purpose issue every time the Secretary raised it on summary judgment.

Because the plaintiffs have never abandoned their viewpoint discrimination claim, this Court should vacate the district court's judgment and remand the case for trial. *See, e.g., Mitutoyo*, 499 F.3d at 1290.

## II.    The Secretary is not entitled to summary judgment on the plaintiffs' Equal Protection claim.

Summary judgment on the plaintiffs' Equal Protection claim is inappropriate here because there is a genuine dispute about whether Georgia's five-percent petition requirement was, in fact, enacted with a discriminatory purpose, and that fact is material to the outcome under the applicable law. Fed. R. Civ. P. 56(a); *Tyson Foods,* 121 F.3d at 646. The Secretary has even conceded the existence of that dispute. (App. III:209 at 1.)

The parties dispute, as a matter of fact, whether Georgia's five-percent petition requirement was adopted or maintained for a discriminatory purpose. The Secretary, relying solely on a 1948

41

attorney general opinion, asserts that the original purpose was nondiscriminatory. (App. II:97 at 10-11; App. III:211-1 at 2.) The plaintiffs, on the other hand, rely on historical documents and expert testimony to support their contention that the original purpose of the requirement was both racially and politically discriminatory and that—not surprisingly—it had the intended effect. (App. I:69-2 at 10-13; App. III:210-2 at 2.)

The parties also dispute whether Georgia's five-percent petition requirement was maintained for a discriminatory purpose. The plaintiffs rely on the lay-witness testimony of a person who was involved in the legislative process. (App. III:210-2 at 2.) The Secretary, on the other hand, points to no evidence at all and merely lodges objections to the cited material. (App. III:211-1 at 2.)

These disputes are genuine. Viewing the evidence in the light most favorable to the plaintiffs, as this Court must, a reasonable factfinder could find that Georgia's five-percent petition requirement was adopted or maintained for a discriminatory purpose. *See Liberty Lobby*, 477 U.S. at 248.

42

These disputes are also material. They matter under the applicable law because ballot-access laws that were adopted or maintained for the purpose of discriminating against an identifiable political group are subject to strict scrutiny under the *Anderson* test.

There, the Supreme Court distinguished between burdens that restrict political participation equally and burdens that "discriminate[] against those candidates and … voters whose political preferences lie outside of the existing political parties." 460 U.S. at 794. When the law places discriminatory burdens on the rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman*, 502 U.S. at 289). *See Anderson*, 460 U.S. at 794 n.16; *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring) (heightened scrutiny is often necessary to ensure that the state's asserted interests are "not merely a pretext for exclusionary or anticompetitive restrictions"); *cf. Cook v. Gralike*, 531 U.S. 510, 524

(2001) (citing *Anderson*); *Cox v. Barber,* 275 Ga. 415, 418 (2002)

(citing *Anderson*).

Following *Anderson*, other courts have applied strict scrutiny

when faced with discriminatory ballot-access laws. *See, e.g.,*

*Graveline v. Benson*, 992 F.3d 524, 535-39 (6th Cir. 2021)

(concluding that a discriminatory ballot-access scheme warranted

strict scrutiny); *Durand v. Raffensperger*, No. 2022CV365171, slip

op. at 25 (Fulton Cnty. Super. Ct. Aug. 18, 2022) (applying strict

scrutiny where the challenged law was motivated by a desire to

keep the plaintiff candidate off the ballot)[3]. *Cf. Larios v. Cox*, 300 F.

Supp. 2d 1320, 1347-48 (N.D. Ga.) (three-judge district court), *aff'd,*

542 U.S. 947 (2004).

Election laws that were adopted or maintained with a racially

discriminatory purpose are also subject to strict scrutiny under the

Equal Protection Clause. *See Hunter v. Underwood*, 471 U.S. 222,

227-28 (1985); *Greater Birmingham Ministries v. Sec'y of State*, 992

F.3d 1299, 1321-22 (11th Cir. 2021). A plaintiff must first show

---

[3] The final order in *Durand* is reprinted in Volume III of the
Appendix at Tab 210-15.

that the law "had a discriminatory purpose and effect." *Greater Birmingham Ministries*, 992 F.3d at 1321. Then, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

These factual disputes are thus material to the outcome because they determine the level of scrutiny that applies and because the Secretary hasn't argued that Georgia's petition requirement would satisfy strict scrutiny. (*See* Def.'s Br. Supp. 3d Mot. Summ. J at 6-16 (ECF 209-1); Def's Reply Supp. 3d Mot. Summ. J. at 8-10 (ECF 211).) As a result, the genuine factual disputes between the parties here preclude summary judgment.

The district court's conclusion to the contrary misreads *Anderson* and its progeny. The court held that discriminatory purpose is irrelevant under the *Anderson* test (App. III:214 at 8-11), but *Anderson* held just the opposite. The Supreme Court applied strict scrutiny in *Anderson* because it found that Ohio's petition deadline wasn't a "reasonable, nondiscriminatory restriction." 460 U.S. at 788; *see also id.* at 793-94; *id.* at 788 n.9 ("We have upheld generally-applicable and *evenhanded* restrictions

45

that protect the integrity and reliability of the electoral process itself." (emphasis added)). The district court cited no other authority for its holding, and the plaintiffs are aware of none.

That's no surprise, because a rule that exempts purposefully discriminatory ballot-access laws from strict scrutiny would open Pandora's box. A party with legislative control would have the virtually unfettered ability to crush their political opponents with restrictive ballot-access laws. Imagine a California law, for example, imposing a five-percent petition requirement on all candidates for United States Representative except those belonging to the Governor's party. Under the district court's version of the *Anderson* test, strict scrutiny would not apply.

The district court's alternative rulings have even less grounding. In a single footnote, the court concluded that the plaintiffs' evidence was insufficient to create a genuine issue of fact and that the challenged statutes satisfied strict scrutiny. (App. III:214 at 12-13 n.5.) But the Secretary had conceded a genuine issue of fact. (App. III:209 at 1.) And even if he hadn't, the district

court wasn't permitted to discount the plaintiffs' evidence at the summary-judgment stage. *Liberty Lobby*, 477 U.S. at 249.

Similarly, the Secretary didn't even argue that the statutes satisfy strict scrutiny, so the district court wasn't permitted to grant summary judgment on that ground. *See* Fed. R. Civ. P. 56(f) (a court may not grant summary judgment on grounds not raised by a party without first giving notice and an opportunity to respond). And a strict-scrutiny analysis consisting of a half-sentence with no discussion of state interests or narrow tailoring is plainly inadequate.

Under these circumstances, this Court should vacate the district court's judgment and remand the case for trial.

## III. The district court abused its discretion by denying the plaintiffs' motion for leave to supplement their complaint.

Rule 15(d) of the Federal Rules of Civil Procedure provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any . . . event that happened after the date of the pleading to be

supplemented." Fed. R. Civ. P. 15(d). Leave to supplement should be granted "freely" when the supplemental facts connect to the original pleading. *Nance v. Ricoh Electronics, Inc.*, 381 F. App'x 919, 923 (11th Cir. 2010); *see generally* 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed.).

"The purpose of subdivision (d) is to promote as complete an adjudication of the dispute between the parties as is possible." *Id.* Typically, leave to supplement should be granted "when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action." *Id.*

A district court has discretion to allow supplemental pleadings "at any time during which the action is before it." Wright & Miller, *supra*, § 1509. That includes "after a trial has concluded" and "on remand after an appeal." *Id.*

Here, the district court had granted summary judgment before the plaintiffs filed their motion to supplement, but the action was still before the district court because the plaintiffs' timely

motion to alter or amend remained pending. That's because a timely motion to alter or amend a judgment suspends the finality of the judgment until the motion is resolved. *Banister v. Davis*, 590 U.S. 504, 508 (2020); *Stallworth v. Shuler*, 758 F.2d 1409, 1410 (11th Cir. 1985) (per curiam). As a result, a plaintiff may amend or supplement a complaint under Rule 15 while a motion to alter or amend is pending. *See Czeremcha v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 724 F.2d 1552, 1556 (11th Cir. 1984). The district court's contrary conclusion that the plaintiffs couldn't supplement their complaint "because Plaintiffs' case was dismissed with the Court's Order on Defendant's Third Motion for Summary Judgment" was legal error and thus an abuse of discretion. (App. III:229 at 5.)

The district court's alternative conclusion that allowing the supplemental complaint would delay the resolution of the case and prejudice the Secretary is unfounded. The only source of prejudice to the Secretary, according to the court, was that allowing the complaint would "requir[e] him to defend a new claim after … a final judgment." (*Id.* at 6.) "Instead," the court explained, the

plaintiffs "may challenge the new Georgia law provision in a separate case." (*Id.*)

But the district court got it backwards. Filing a new action would delay resolution of the merits and force the Secretary to litigate the basic facts of this case all over again. *See Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 599–600 (5th Cir. Nov. 1981) (By refusing post-judgment amendment, "the action would proceed on the basis of the new complaint[,] the functional equivalent of granting the motion to amend. All that is accomplished is that the case is set back on the docket, and disposition of the merits delayed . . . .").

It would also be unjust. The plaintiffs have litigated this case diligently for more than seven years. The record is voluminous. Throwing out all of that work while recognizing the plaintiffs' ability to file the supplemental complaint as a new action is arbitrary at best. It would also undermine the interests of judicial economy and the "just, speedy, and inexpensive determination of" this action. Fed. R. Civ. P. 1. The supplemental complaint connects

directly to the original pleading because it sets out a recent change to the ballot-access scheme challenged on day one of this case.

Under these circumstances, the district court's denial of the plaintiffs' motion for leave to supplement was an abuse of discretion.

## Conclusion

This case has been going on for a long time. The plaintiffs have litigated diligently, and there are genuine issues of material fact that preclude summary judgment on the claims based on the plaintiffs' discriminatory purpose theory. Though reversal means that the case will go on even longer, the plaintiffs are entitled to litigate their claims in full. This Court should therefore reverse the district court for a third time and remand the case for further proceedings.

Dated: January 17, 2025

**/s/ *Bryan L. Sells***
Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

*Attorney for the Appellants*

## Certificate of Compliance

This brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure because, excluding parts of the brief exempted by Rule 32(f), it contains 6,820 words. This brief also complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook font using Microsoft Word for Mac.


**/s/ *Bryan L. Sells***
Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

*Attorney for the Appellants*